United States District Court
Southern District of Texas
**ENTERED**
December 21, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TOMEU VADELL, *et al.*, *Plaintiffs*, | § § § § | |
| v. | § § | CIVIL ACTION NO. 4:23-CV-1082 |
| CITGO PETROLEUM CORPORATION, *Defendant*. | § § § | |

## ORDER

This is not the first time this Court has had to deal with the Bolivarian Republic of Venezuela, its national oil company, Petróleos de Venezuela, S.A. (PDVSA), and the seemingly everchanging political landscape in that country. This time, however, the Court may also be faced with the prospect that the political landscape in the United States may be shifting. Moreover, the Court has never addressed these issues in the context of a Motion to Remand.[1]

**I.   Procedural Background**

Plaintiffs contend that the Defendant, CITGO Petroleum Corporation ("CITGO"), employed Tomeu Vadell ("Vadell") in 2017 to oversee all of CITGO's refineries in the United States. In mid-November, CITGO asked Vadell to fly to Caracas, Venezuela to attend a meeting with PDVSA along with seven or eight other CITGO employees, all of whom were of Venezuelan descent. On the day of their scheduled return, six of the employees, including Vadell, were seized by armed security agents and forced into a military prison where they remained for nearly 5 years. The alleged explanation for this treatment centered around an "unconsummated refinancing" deal that Vadell maintains was not connected in any fashion with his job duties at CITGO.

---

[1] It is not surprising, however, that these issues pop up in the most surprising motions. The Court last addressed the Venezuela political scene when ruling on a motion to substitute counsel. *See Impact Fluid Solutions LP v. Bariven SA*, 4:19-CV-00652, (Doc. No. 55, Order on Motion to Substitute).

Vadell was finally released in October 2022 and was reunited with his family. Tomeu and Dennysse Vadell reside in Louisiana. Their daughter, Cristina Vadell, also resided in Louisiana at one time, but eventually moved to Houston, Texas. In March 2023, Plaintiffs filed this lawsuit in the 334th Judicial District of Harris County, Texas. For diversity jurisdictional purposes, CITGO is considered a resident of Texas. The Original Petition explicitly disclaimed any federal cause of action, and the state claims included causes of action for: (1) conspiracy and aiding and abetting; (2) false imprisonment; (3) intentional infliction of emotional distress; (4) negligence; and (5) gross negligence. *See* (Doc. No. 1-1 at 2–25, Original Complaint). A few days after filing the Original Petition, Plaintiffs filed an Amended Petition in which they set out that Cristina Vadell was a resident of Texas, and not of Louisiana. (Doc. No. 1-1 at 26–49, Plaintiffs' First Amended Original Petition). CITGO removed the case to this Court based on diversity jurisdiction, arguing that Cristina Vadell is in fact a citizen of Louisiana—thus diversity among the parties existed. (Doc. No. 1 at 2–3, Defendant's Notice of Removal). CITGO further argues that, regardless of Cristina Vadell's citizenship, none of her claims are viable causes of action and her claims should therefore be ignored. Finally, CITGO claims that this Court would still have federal question jurisdiction even if it considered Cristina to be a Texan and to have valid claims because Plaintiffs' claims are "based on the acts of the Bolivarian Republic of Venezuela." (*Id.* at 4–5).

Plaintiffs filed a Motion to Remand, Defendant filed a Response in opposition, and Plaintiffs in turn filed a Reply. (Doc. Nos. 9, 13, 15).[2] The Court will first address the diversity claim, and then will address the federal question issue.

---

[2] Plaintiffs have also filed a Motion to Dismiss Defendant's counterclaims. (Doc. No. 19). Given this Court's ruling, that Motion will need to be addressed at a later time.

2

II.     **Does Diversity of Citizenship Exist?**

All parties seem to agree that Tomeu and Dennysse Vadell are citizens of Louisiana, and that CITGO is a Delaware corporation with its principal place of business in Houston, Texas. Thus, if Cristina Vadell were not a party, it is clear that the Court would have jurisdiction based upon diversity of citizenship, at least absent the question as to whether a forum defendant can remove. 28 U.S.C. § 1441(b)(2). Plaintiffs claim that Cristina is a citizen of Texas, but CITGO contends she is a really a citizen of Louisiana and that her claim of Texas residency does not pass muster. CITGO also argues that, even if Cristina were a resident of Texas, her causes of action are meritless or barred, which would put her in the same position as a fraudulently joined defendant, and her citizenship should be ignored.

Initially, the Court addresses the simplest allegation. The Court finds that, while Cristina may have once been a citizen of Louisiana, she has moved to Houston and established her residency here long before this lawsuit. The Court can understand CITGO's suspicions, but the Court does not find any fire to go along with what CITGO might consider smoke. There is no evidence of fraud being effectuated and no evidence of "artful" or "deceitful" behavior behind Cristina's relocation to Texas. The Court therefore concludes she is a citizen of Texas.

III.    **Does Cristina Have Valid Claims?**

The next issue raised by CITGO is one that might be categorized as a "standing" issue. Does Cristina—an adult child of Tomeu—have any claim for damages for his alleged wrongful detention?

In *Reagan v. Vaughn*, the Supreme Court of Texas first recognized a cause of action for loss of parental consortium. *Reagan v. Vaughn*, 804 S.W.2d 463 (Tex. 1990). Notably, the

3

Supreme Court of Texas declined to limit the right to recover to minor children, instead allowing adult children to recover as well.

> Consistent with our prior recognition that adult children may recover for the wrongful death of a parent, we decline to limit the right of recovery under this cause of action to minor children. "Although minors are the group most likely to suffer real harm due to a disruption of the parent-child relationship, we leave this to the jury to consider in fixing damages." *Ueland*, 691 P.2d at 195; *see also Audobon-Exira Ready Mix, Inc. v Illinois Cent. Gulf Co.*, 335 N.W.2d 148, 152 (Iowa 1983) ("even adult and married children have the right to expect the benefit of good parental advice and guidance") (citing *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 665 (Iowa 1969)).

*Reagan*, 804 S.W.2d at 466.

In creating this cause of action, the Court stated that a claim for parental loss of consortium is derivative in nature in so far as the tortfeasor's liability to the injured parent must be proven. Thus, in order to recover for loss of parental consortium, the child must prove that the defendant is liable to the parent for the personal injuries causing the loss of consortium. *See id*. Consequently, "the defenses which bar all or part of the injured parent's recovery have the same effect on the child's recovery." *Id.* at 468.

Here, CITGO argues that Cristina's loss of consortium claim must be dismissed as untimely under Texas's two-year statute of limitations. CITGO does not deny, however, that Tomeu's recovery is governed by his tolling agreement with CITGO. Thus, despite Texas's statute of limitations, Tomeu's claims were filed timely. When faced with issues regarding the statute of limitations in parental loss of consortium claims, Texas courts appear to find that a child's statute of limitations parallels that of their parent's.

"We conclude that the Texas Supreme Court intended the running of the statute of limitations on the injured parent's cause of action to extinguish the child's claim for loss of consortium, especially since limitations is a defense which would bar the injured parent's recovery." *Nash ex. Rel. Nash v. Selinko*, 14 S.W.3d 315, 318 (Tex. App.—Houston [14th Dist.]

4

1999, pet. denied). "Under Texas law, claims for loss of parental consortium are extinguished by the running of the statute of limitations on the injured person's underlying claim." *Maes v. El Paso Orthopaedic Surgery Grp., P.A.*, 385 S.W.3d 694 (Tex. App. 2012) (citing *Upjohn Co.*, 885 S.W.2d at 541; *Nash ex. rel. Nash v. Selinko*, 14 S.W.3d at 318; *Martinez v. Humble Sand & Gravel, Inc.*, 940 S.W.2d 139, 148 (Tex. App.—El Paso 1996), *aff'd sub nom. Childs v. Haussecker*, 974 S.W.2d 31 (Tex. 1998)).

Given that Tomeu's suit was timely filed and is thus not barred, the Court finds that CITGO has failed to prove as a matter of law that Cristina's loss of consortium claim has no possibility of success (as is its burden). Texas courts appear to be in agreement that a child's ability to recover is derivative of their parent's and is thus governed by a parallel statute of limitations. CITGO has pointed to no Texas case law to the contrary. More importantly, Tomeu was released on October 1, 2022. This lawsuit was filed on March 17, 2023. CITGO has not demonstrated that the causes of action pleaded are not continuing causes of action. If so, even if the two-year statute of limitations controlled, Cristina could recover for her damages dating back to March 17, 2021—at which time Tomeu was still in Venezuelan custody.

This Court cannot conclude as a matter of law that Cristina has no valid claims.

**IV.    Is the Removal Justified Because Federal Question Jurisdiction Exists?**

**A.    *Grable***

CITGO claims federal question jurisdiction exists due to the *Grable* doctrine or alternatively under the "act of state" doctrine. (Doc. No. 13 at 10–12). Both so-called theories are closely related and in certain cases even overlap. The *Grable* doctrine refers to a legal dispute in which the resolution of state law claims is so intertwined with issues of federal law that a federal forum is proper despite the fact that no federally based cause of action has been pleaded. *Grable*

5

*& Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). As CITGO points out, the reasoning justifying this doctrine is the "notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers...." *Id.* at 312. To fall into this category, the state law claim must: (1) necessarily raise a federal issue; (2) that issue must be actually disputed; (3) that issue must be substantial; and (4) it must be capable of being resolved in a federal court without upsetting the federal-state balance contemplated by Congress. *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

CITGO argues that the first component (a necessarily raised federal question) is satisfied by the fact that this case implicates important federal foreign policy questions. It claims that Plaintiffs' claim will eventually necessitate a court to hold that an official act of a foreign government performed within its own territory is invalid. More specifically, it would require this or some other court to hold that Venezuela's arrest and detention of Tomeu in Venezuela in 2017 was invalid.

It argues that the attempt to sue CITGO for this imprisonment should be governed by the rule espoused in *Torres v. Southern Peru Copper Corp.*, 113 F.3d 540 (5th Cir. 1997). In that case, hundreds of Peruvian citizens sought to hold Southern Peru Copper Corporation (SPCC) liable in a Texas court for injuries allegedly suffered from exposure to its smelting operation in Peru. The case was actually dismissed on the basis of *forum non conveniens* and "comity among nations." The case had originally been filed in state court and, like this one, was removed. Peru filed a letter of protest with the State Department with regard to the lawsuit and submitted an *amicus curiae* brief at the trial court level. SPCC was at the time one of Peru's largest companies. Moreover, the government of Peru was a substantial participant in SPCC's activities and at one point in the

6

relevant time period owned the smelter that was the subject of the suit. Thus, damages were being sought for activities in which the Peruvian government had been actively engaged. The Fifth Circuit affirmed the District Court's finding of jurisdiction and its ultimate dismissal of the case (despite the fact that there was no diversity) due to the involvement of the Peruvian government.

Plaintiffs respond that CITGO waived its federal question argument, and that CITGO has over the years taken inconsistent stances regarding the government of Venezuela. Finally, and more importantly, Plaintiffs argue that there will be no need for a court to find the arrest and imprisonment wrongful because the State Department already has. Thus, they contend that *Grable* and its progeny are not implicated.

The Court does not find that Defendant has waived its claim to federal question jurisdiction. While it did primarily rely on its claim of diversity jurisdiction in its removal notice (28 U.S.C. § 1332), it also claimed that jurisdiction was proper and that §§ 1330 (actions against foreign states) and 1331 (federal question) applied. (Doc. No. 1 at 2). Furthermore, Defendant stated:

> Moreover, absent artful pleading, Plaintiffs' claims require the presence of, or are based on the acts of, the Bolivarian Republic of Venezuela, which gives rise to federal jurisdiction under 28 U.S.C. § 1330, and necessarily raises federal questions under 28 U.S.C. § 1331 relating to foreign sovereign immunity and the act-of-state doctrine.

(Doc. No. 1 at 4–5, ¶ 21).

The Court finds these statements to give fair notice that CITGO was not merely relying on § 1332 as a basis for its removal. Consequently, the Court overrules waiver as a basis to order remand.

Plaintiffs also seem to suggest that CITGO has waived its substantive *Grable* argument by the fact that it has taken "inconsistent" positions as to the legitimacy of the acts taken by the Maduro Administration in Venezuela. This Court did not find CITGO's somewhat-shifting

7

position as time progressed to be a waiver of the argument it is making here, nor does the Court find that it amounts to some form of estoppel or judicial admission. To the contrary, if it has any effect, it highlights the problems currently facing this Court and the parties. This Court finds this argument to have little substance.

Ultimately, CITGO is claiming this Court has jurisdiction because of two overlapping concepts. It claims that this case by necessity requires a court to resolve substantial issues of federal law and that, under the principles set out in *Grable*, that resolution must be done in a federal court, even though Plaintiffs' Petition only asserted state causes of action. *Grable* involved an entirely domestic dispute and allegations of state law, but it turned on the meaning of certain federal tax provisions. The *Grable* court held that "federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, 545 U.S. at 313. Secondly, *Grable* set out additional requirements for a state law claim to be the subject of federal jurisdiction. Not only must the federal question be a substantial and contested, but the exercise of federal jurisdiction must also be consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331. *Id.* at 313–14; *but see Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700–01 (2006).

This Court does not find the *Grable* doctrine to apply here. There are no substantial questions of federal law at stake that must be resolved to conclude the case. The Plaintiffs' causes of action are well-established state claims, brought by citizens of the United States in Texas against a Texas defendant and those claims do not turn on any substantial question of federal law.

**B.      Act of State**

Importantly, though, CITGO's federal question jurisdiction claims include a second argument that this Court should assume jurisdiction because of the "act of state" doctrine. The "act of state" doctrine presents a different shade of a similar premise for federal jurisdiction. It springs from "the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of the Nation's foreign policy." *First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 769 (1972). Under the doctrine, the courts exercise jurisdiction, but decline to decide certain issues. *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371 (5th Cir. 1980). The Fifth Circuit described the doctrine as follows:

> The act of state doctrine received its classic expression in *Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897):
>
>> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.
>
> * * *
>
> The act of state doctrine recognizes, however, that in the international context, refusing to enforce foreign law because it is contrary to U.S. conceptions of public policy is unduly parochial and is likely to insult the foreign sovereign, thereby embarrassing the foreign policy of the United States. As the Supreme Court noted in *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), the act of state doctrine
>
>> rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign state to be re-examined and perhaps condemned by the courts of another would very certainly "imperil the amicable relations between governments and vex the peace of nations."

*Id.* at 303–04, 38 S.Ct. at 311.

9

*Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113–114 (5th Cir. 1985) (internal footnotes omitted).

While CITGO's argument includes both *Grable* and act of state contentions, the Court finds its argument fits most comfortably under the latter. In effect, CITGO's *Gable* argument is that the substantial and necessary federal question is that courts are precluded from passing on the validity of "an official act of a foreign sovereign performed within its own territory." (Doc. No. 13 at 11–12) (citing *Gomez v. Schooner Petroleum Servs., Inc.*, No. 08-cv-171, 2008 WL 11391131, at *1–3 (S.D. Tex. Oct. 16, 2008)). CITGO claims the acts in question are the arrest and detention of Tomeu. That being the case, the Court finds this to fall more neatly under the act of state doctrine.

The act of state doctrine, while infrequently raised, has been the subject of multiple cases from the United States Supreme Court, and the doctrine's application (or at least the theory behind its application) has evolved in recent decades. The Supreme Court described the doctrine in *First National* as follows:

> The act of state doctrine represents an exception to the general rule that a court of the United States, where appropriate jurisdictional standards are met, will decide cases before it by choosing the rules appropriate for decision from among various sources of law including international law. *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900). The doctrine precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State. It is clear, however, from both history and the opinions of this Court that the doctrine is not an inflexible one. Specifically, the Court in *Sabbatino* described the act of state doctrine as 'a principle of decision binding on federal and state courts alike but compelled by neither international law nor the Constitution,' 376 U.S. at 427, 84 S.Ct. at 940, and then continued:
> '(I)ts continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs.' *Id.*, at 427–428, 84 S.Ct. at 940.

*First Nat. City Bank*, 406 U.S. at 759 (1972).

Two decades later, the Supreme Court described its application succinctly:

10

> In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory. In *Underhill v. Hernandez*, 168 U.S. 250, 254, 18 S.Ct. 83, 85, 42 L.Ed. 456 (1897), holding the defendant's detention of the plaintiff to be tortious would have required denying legal effect to "acts of a military commander representing the authority of the revolutionary party as government, which afterwards succeeded and was recognized by the United States."

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). The majority noted, however, the changing trend in what justified the doctrine's application.

> This Court's description of the jurisprudential foundation for the act of state doctrine has undergone some evolution over the years. We once viewed the doctrine as an expression of international law, resting upon "the highest considerations of international comity and expediency," *Oetjen v. Central Leather Co.*, 246 U.S. 297, 303–304, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). ***We have more recently described it, however, as a consequence of domestic separation of powers, reflecting "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder" the conduct of foreign affairs***, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964). Some Justices have suggested possible exceptions to application of the doctrine, where one or both of the foregoing policies would seemingly not be served: an exception, for example, for acts of state that consist of commercial transactions, since neither modern international comity nor the current position of our Executive Branch accorded sovereign immunity to such acts, *see Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695–706, 96 S.Ct. 1854, 1861–1867, 48 L.Ed.2d 301 (1976) (opinion of WHITE, J.); or an exception for cases in which the Executive Branch has represented that it has no objection to denying validity to the foreign sovereign act, since then the courts would be impeding no foreign policy goals, *see First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 768–770, 92 S.Ct. 1808, 1813–1815, 32 L.Ed.2d 466 (1972) (opinion of REHNQUIST, J.).

*Id.* at 404–405 (emphasis added).

Plaintiffs contend that the act of state doctrine does not compel either the denial of Plaintiffs' motion to remand or the Defendant's motion to dismiss. Plaintiffs first argue that the act of state doctrine is essentially a defense and that a defense cannot be used to establish jurisdiction. While that statement is certainly indicative of the general rule concerning federal jurisdiction, it is clear that removal based upon substantial issues of federal law can be the basis

11

of jurisdiction in either of the *Grable* line of cases or the "act of state" line of cases. Many may classify this as an exception to the general rule. Others may argue that the federal issue is not raised by the defense, but it is raised by what the Plaintiffs plead. Regardless, in this case for the Plaintiffs to proceed and succeed on their claims as pleaded, they need to have whatever court hears the case to find the arrest and detention of Tomeu by the government of Venezuela was wrongful. Thus, the Court does not find this remand argument to be compelling.

The more intriguing argument in favor of remand is that the federal government has already found the acts of the Venezuelan government to be wrongful. (This argument may actually fit one of the exceptions noted above by the Supreme Court). They support this argument with multiple letters from State Department officials. For example, one letter states in pertinent part:

> Pursuant to the Robert Levinson Hostage Recovery and Hostage-taking Accountability Act, Section 302(c) of the Consolidated Appropriations Act, 2021, Public Law 116-260, U.S. citizen ***Tomeu Vadell was determined by the Department of State to have been wrongfully detained by the Bolivarian Republic of Venezuela***. He was held in El Helicoide Prison, Caracas, from November 21, 2017, until October 1, 2022. During this period, he was unable to travel, freely communicate, or complete documentation necessary to manage his personal affairs. The Department of State has been engaged on Mr. Vadell's case ***throughout his wrongful detention*** and remains committed to doing what is possible to support Mr. Vadell's welfare.

(Doc. No. 16-1, Ex. D to Plaintiffs' Reply to Defendant's Motion to Remand) (emphases added).

This letter, dated October 6, 2022, is not addressed to a specific person or entity. It is signed by Ambassador Robert D. Carstens in his position as Special Presidential Envoy for Hostage Affairs.[3] There was also an earlier letter from Ambassador Carstens to a similar effect. On May 26, 2022, Ambassador Carstens wrote that Tomeu Vadell had been wrongfully detained in Venezuela since his arrest on November 21, 2017. (Doc. No. 16-3).

---

[3] Ambassador Carstens is credited for leading the negotiations that led to the release of the CITGO-6 (which included Tomeu) as well as other hostages worldwide.

12

Additionally, on October 1, 2022, the President of the United States issued the following statement:

> Today, ***after years of being wrongfully detained in Venezuela***, we are bringing home Jorge Toledo, ***Tomeu Vadell***, Alirio Zambrano, Jose Luis Zambrano, Jose Pereira, Matthew Heath, and Osman Khan.
>
> * * *
>
> It is also a priority of my Administration to prevent Americans from having to endure the unimaginable pain of being held hostage or wrongfully detained. This summer, ***I signed an executive order that will impose new costs, including sanctions and visa bans, against the perpetrators of such acts.*** In addition, the State Department has introduced a new warning indicator "D" that is designed to help Americans understand where and when travel may incur increased risks of wrongful detention, potentially for long periods of time. If travelers make the decision to go despite this "D" warning, they need to know that they are incurring massive personal risk and that it may not be feasible for the U.S. Government to secure their release.

Presidential Statement on the Return of United States Citizens Wrongfully Detained in Venezuela (Oct. 1, 2022) (emphases added).

Thus, the Plaintiffs claim with some justification that the Executive Branch has already spoken and that this Court need not worry about straying into foreign policy territory.

This lawsuit clearly requires a finding that Venezuela wrongfully arrested and detained Tomeu. This is true, despite the fact that only CITGO is a defendant. Without a finding of wrongful detainment, CITGO's alleged wrongdoing does not lead to any harm. The political pronouncements of the President and/or the Ambassador do not equate to a judicial or jury finding. Plaintiffs' Petition hinges on the fact that CITGO knew or should have known that Venezuela would wrongfully snatch Tomeu and the other members of the CITGO-6—and that armed with that knowledge, CITGO either ordered or lured its employees to leave the United States and attend the fateful meeting in Caracas.

The act of state doctrine normally applies when:

13

> Rather than narrowly focusing on the status of the act and actor complained of, we examine more generally the underlying acts of the foreign state. In the act of state context, ***even if the defendant is a private party***, not an instrumentality of a foreign state, and even if the suit is not based specifically on a sovereign act, ***we nevertheless decline to decide the merits of the case if in doing so we would need to judge the validity of the public acts of a sovereign state performed within its own territory***. *Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940; *Compania de Gas de Nuevo Laredo v. Entex, Inc.*, 686 F.2d 322, 325–26 (5th Cir.1982) (applying act of state doctrine in suit between private parties), cert. denied, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 794 (1983); *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706 (5th Cir.) (same), cert. denied, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968).[4]

*Callejo*, 764 F.2d at 1113 (emphases added).

Thus, it is clear that this case would ordinarily fall under the act of state prohibition.

The question thus becomes: does the fact that the Administration/Executive Branch of the United States has already publicly found Venezuela's acts to be wrongful with respect to the very plaintiff who is at the heart of this suit change things? While the answer to this question may be in and of itself perplexing, the situation has perhaps become even more complicated given recent events.

In short, characterizing the United States' relationship with Venezuela—particularly with the administration of Nicolas Maduro—is not a straightforward task. For instance, in November 2017 (the time of Tomeu's arrest and detention) the United States had recognized Maduro as the leader of Venezuela. In January 2019 (still during Tomeu's detainment), the National Assembly of Venezuela declared that Maduro was not the President and instead recognized Juan Guaidó as Interim President. The United States in turn recognized Guaidó and withdrew any formal recognition of Maduro. Thus, assuming Plaintiffs' allegations are true, it appears that the CITGO-6 were detained and imprisoned by a legitimate administration that soon thereafter (less than 18 months) became an illegitimate administration not recognized by this country.

---

[4] *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).

14

Events from earlier this year further complicate this Court's task of assessing the United States' foreign policy with regard to Venezuela. In October 2023, the Maduro Administration and the opposition party (called the Unitary Platform) reached an agreement to hold free elections, and in recognition of this agreement, the Biden Administration offered to lift certain sanctions, including the prohibition of Venezuela to sell oil to the United States. The result of the primary of the democratic opposition party was held in October of this year and was almost immediately nullified. Consequently, developments on the Venezuelan election front are ongoing, and the Court does not assume it can predict how or if the Biden administration will respond to any future developments. Given the complexity and nuance of the situation, even with the Executive's prior condemnation of Vadell's imprisonment, the Court is not prepared to rule on whether this case implicates recognizing the validity of a foreign sovereign's act, thereby implicating the act of state doctrine, without allowing the Administration to express its position.

## V.  Conclusion

The Court finds that no diversity jurisdiction exists as both Cristina and the Defendant are Texas citizens. It also finds that Cristina has viable claims, at least at this stage. While it does not find that CITGO waived its federal question removal arguments, it finds that this case does not fall within the context of *Grable*—so neither diversity nor *Grable* are grounds for denying the Motion to Remand. The Court does find that the question of exercising jurisdiction versus remanding the case to state court turns on whether the act of state doctrine applies. While the multiple complications described above do not directly implicate the ultimate questions a jury may be asked, they do perhaps demonstrate a fluid and complicated political situation that influences at

least two different issues that have impacted our economy and/or our border security situation.[5] Therefore, the Court gives the Executive Branch the opportunity to file a Statement of Interest pursuant to 28 U.S.C. § 517 should the Executive Branch find the United States has an interest in this litigation and the act of state doctrine to be implicated. The Clerk of the Court is hereby ordered to serve this Order on the Attorney General at:

Hon. Merrick B. Garland
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

The Clerk is further ordered to serve this Order on Alamdar S. Hamdani, United States Attorney for the Southern District of Texas, and Daniel David Hu, the Chief of the Civil Division of the United States Attorney's Office for the Southern District of Texas at:

Alamdar S. Hamdani
United States Attorney
Southern District of Texas
1000 Louisiana Street, Suite 2000
Houston, TX 77002
(713) 567-9305
Alamdar.hamdani@usdoj.gov

Daniel D. Hu
Chief – Civil Division
Office of the United States Attorney
Southern District of Texas
1000 Louisiana Street, Suite 2300
Houston, TX 77002
(713) 567-9018
David.hu@usdoj.gov

The Court will withhold ruling on the Motion to Remand until February 15, 2024, in order to give the United States time to file a statement of interest should it desire to do so.

SIGNED this 21st day of December 2023.

Andrew S. Hanen
United States District Judge

---

[5] Indeed, even as this opinion is being finalized, the White House announced a prisoner swap that has been negotiated over the last few weeks between the United States and the Maduro Administration. Presidential Statement on Securing the Release of Americans Detained in Venezuela (Dec. 20, 2023).